# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

**Mark Steven Gaul,**                    Civ. No. 13-163 (JNE/AJB)

       Plaintiff,

                               **REPORT AND RECOMMENDATION**

**v.**

**Carolyn W. Colvin,**[1]

**Acting Commissioner of Social Security**,

       Defendant.

_____

Dori H. Leland, Esq., 250 Marquette Ave., Suite 1380, Minneapolis, MN 55401, for Plaintiff.

Ana H. Voss, Asst. United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for the Commissioner.


ARTHUR J. BOYLAN, United States Chief Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g) Plaintiff Mark Steven Gaul seeks judicial review of the

final decision of the Commissioner of Social Security.  This matter is before the undersigned

Chief United States Magistrate Judge Arthur J. Boylan for a report and recommendation to the

District Court on the parties' cross-motions for summary judgment.  [Doc. Nos. 12, 18.]  *See* 28

U.S.C. § 636(b)(1) and Local Rule 72.1  Based on the reasoning set forth below, this Court

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. http://www.ssa.gov/pressoffice/factsheets/colvin.htm  She is substituted as the defendant pursuant to Fed.R.Civ.P. 25(d).

recommends that Plaintiff's motion for summary judgment be granted [Docket No. 12], and Defendant's motion for summary judgment be denied [Docket No. 18].

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  <u>Procedural History</u>

Plaintiff protectively filed an application for supplemental security income ("SSI") on June 24, 2009, based on major depressive disorder.  (Tr. 32, 160-65, 177.)  His application was denied initially and upon reconsideration.  (Tr. 73-77, 82-85.)  Plaintiff requested a hearing before an administrative law judge, and hearings were held on January 24, 2011, and August 29, 2011, before Administrative Law ("ALJ") Diane Townsend-Anderson.  (Tr. 89-91, 29-69.)  The ALJ issued an unfavorable decision on November 8, 2011.  (Tr. 8-28.)  Plaintiff requested review of the ALJ's decision by the Appeals Council, and the Appeals Council denied Plaintiff's request on November 27, 2012, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)  *See* 20 C.F.R. § 416.1481.  On January 18, 2013, Plaintiff sought review from this Court.  The parties then filed cross-motions for summary judgment.

### B.  <u>Background and Medical Evidence</u>

Plaintiff has a high school education.  (Tr. 181.)  In the last fifteen years, he could not hold a job for more than two or three months at a time.  (Tr. 178.)  Plaintiff was homeless and living in a shelter when he applied for SSI.  (Tr. 194.)  He alleges disability due to anxiety, difficulty concentrating and following instructions, and depression preventing him from getting out of bed.  (Tr. 178.)

Plaintiff presented to HCMC Mental Health Center on June 18, 2009, just days after losing his housing in a board and lodging facility where he had lived for seven years, because he

was caught drinking in his room.  (Tr. 312, 317.)  Plaintiff wanted treatment for depression.  (*Id.*)  His symptoms were isolation, disrupted sleep, loss of appetite, lethargy and low motivation.  (*Id.*)  Plaintiff began attending group therapy days later.  (Tr. 309.)  He said he was "in a void" for seven years, not accomplishing anything, just existing.  (*Id.*)  Plaintiff was cooperative, but he was depressed.  (*Id.*)

Plaintiff underwent a diagnostic assessment with John W. Robertson-Smith, a licensed psychologist at Hennepin County Mental Health Center, on June 22, 2009.  (Tr. 320-322.)  Plaintiff was living in a shelter and had no income.  (Tr. 320.)  His depression had increased when he was evicted.  (*Id.*)  Plaintiff's mood was dysthymic, but otherwise his mental status examination was normal.  (*Id.*)  Dr. Robertson-Smith referred Plaintiff to Dr. Langsten for medication evaluation.  (Tr. 322.)

Dr. Langsten saw Plaintiff the same day to assess his need for psychiatric medication.  (Tr. 316.)  The death of Plaintiff's sister triggered his first relapse with alcohol in November 2008, and he relapsed again recently, causing him to be evicted.  (Tr. 317.)  Plaintiff had some friends, but for the last two or three years, he isolated himself because he felt anxious around other people.  (*Id.*)  Plaintiff's feeling of isolation was longstanding, going back to his childhood; his father died when Plaintiff was eleven, and his mother "was not available emotionally."  (Tr. 318.)  Plaintiff was the youngest of nine siblings, and most of Plaintiff's siblings were out of the home when Plaintiff was growing up.  (*Id.*)  Plaintiff was ostracized and isolated in high school.  (*Id.*)

Plaintiff was living in a shelter, not sleeping well, and he felt hopeless.  (*Id.*) He had a very distant history of a suicide attempt.  (*Id.*)  He did not want to take medication unless his

troubled sleep continued.  (Tr. 319.)  Plaintiff admitted that he had difficulty maintaining

employment primarily due to his alcohol use.  (Tr. 318.)  He had been through chemical

dependency treatment several times and he was abstinent for several years.  (*Id.*)  His last job

was in 2000 as a mail clerk at a bank.  (*Id.*)

On examination, Plaintiff was cooperative but anxious and dysthymic.  (*Id.*)  His affect

was appropriate, and he was fully oriented.  (*Id.*)  His memory and cognitive functions were

intact.  (*Id.*)  His intelligence was in the normal range, and his judgment, insight and motivation

appeared to be good.  (*Id.*)  Dr. Langsten diagnosed depressive disorder, not otherwise specified

("NOS") with situational features versus major depressive disorder by history; alcohol

abuse/dependence in early remission; and to further consider (or rule out) post traumatic stress

disorder, anxiety disorder and personality disorder.  (Tr. 319.)  He assessed Plaintiff with a GAF

score of 50 to 60.[2]  (*Id.*)  Under Axis IV[3] of the diagnosis, Dr. Langsten noted Plaintiff had a

long history of emotional and chemical problems.  (*Id.*)  Plaintiff had a history of being

emotionally neglected and possibly emotionally abused during childhood.  (*Id.*)   Dr. Langsten

recommended individual and group therapy.  (*Id.*)

_____

[2] The Global Assessment of Functioning Scale ("GAF"), a scale of zero to 100, is used by clinicians
to subjectively rate an adult client's social, occupational or school functioning.  *Diagnostic and
Statistical Manual of Mental Disorders* 32 (American Psychiatric Assoc. 4th ed. text revision 2000)
("DSM-IV-tr").  Scores from 41 to 50 indicate serious symptoms or any serious impairment in
social, occupational or school functioning.  *Id.* at 34.  Scores from 51 to 60 indicate moderate
symptoms or moderate difficulty in social, occupational or school functioning.  *Id.*

[3] Axis IV of the diagnostic system in the DSM-IV-tr is for reporting psychosocial and
environmental problems that may affect the diagnosis, treatment and prognosis of mental
disorders.  DSM-IV-tr at 31.

Plaintiff returned to see Dr. Langsten in July 2009, asking for medication to help him sleep. (Tr. 315.) He complained of ongoing anxiety and fluctuating moods. (*Id.*) Plaintiff's mood was anxious and a bit dysthymic. (*Id.*) Dr. Langsten prescribed Ambien on an as needed basis. (Tr. 315-16.) On August 19, 2009, Plaintiff asked Dr. Langsten to refer him for individual therapy to work on managing his feelings. (Tr. 352-53.) Plaintiff was anxious and dysthymic. (Tr. 353.) His mental status was unchanged on October 23, 2009. (Tr. 351.) Plaintiff had been attending group therapy on a regular basis. (*Id.*) Dr. Langsten prescribed Remeron.[4] (Tr. 352.)

Plaintiff had his first individual therapy session with Social Worker Kathleen Sapp on November 9, 2009. (Tr. 350.) Sapp noted Plaintiff was managing his depression, and he recognized his need to get out into the community and engage in activities and relationships. (*Id.*) In group therapy the next month, Plaintiff said he had a few good leads on getting into school. (Tr. 404.) In occupational therapy, Plaintiff talked about obtaining housing, finding work, and looking into volunteer opportunities. (Tr. 403.) Plaintiff was able to get medical assistance and YMCA membership. (Tr. 402.) At the end of December, Plaintiff expressed his frustration with seeking SSI, stating that he would rather go to school and learn a trade. (Tr. 400.) The next week, Plaintiff was feeling overwhelmed and had not followed through with housing and employment opportunities. (Tr. 399.) In mid-January 2010, Plaintiff urgently needed to find housing. (Tr. 397.)

---

[4] Remeron (mirtazapine) is used to treat depression by restoring the balance of neurotransmitters in the brain. Drugs & Medications - Remeron Oral, available at http://www.webmd.com/drugs/drug-13707-Remeron+Oral.aspx

Plaintiff saw Dr. Langsten on January 15, 2010, and he was still having problems, but he was finding therapy helpful. (Tr. 394.) On mental status examination, Plaintiff was anxious and dysthymic. (Tr. 394-95.) Dr. Langsten diagnosed major depressive disorder, PTSD, alcohol abuse/dependence in full remission, and to rule out personality disorder. (Tr. 395.) Plaintiff was in better spirits a few days later. (Tr. 393.)

In February 2010, Plaintiff obtained transitional housing, although he had not moved in. (Tr. 386.) Dr. Grant Berg praised Plaintiff for his progress. (*Id.*) Kathleen Sapp noted that Plaintiff would graduate from the Connections Group for homeless men. (Tr. 382.) Shortly after Plaintiff moved into his new residence, he seemed more relaxed and well rested. (Tr. 374.) In March 2010, Plaintiff was still waiting to hear if he was eligible for rehabilitative services. (Tr. 391.)

On February 16, 2010, Dr. Langsten completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ("MSS") regarding Plaintiff for the Social Security Administration. (Tr. 366-68.) Dr. Langsten opined Plaintiff had severe anxiety with depressed mood and impaired concentration. (Tr. 366.) He believed Plaintiff's emotional instability prevented him from keeping a job since 2000. (*Id.*) Dr. Langsten opined Plaintiff had moderate limitations in understanding, remembering and carrying out short, simple instructions; and he had marked limitations in understanding, remembering and carrying out detailed instructions, and in making judgments on simple work-related decisions. (*Id.*) Furthermore, he opined Plaintiff would be moderately impaired in interacting appropriately with the public, and markedly impaired in interacting appropriately with supervisors, coworkers, and in responding to

work pressure and changes in a routine work setting. (Tr. 367.) Dr. Langsten stated that Plaintiff was abstinent from chemical substances since June 2009. (Tr. 368.)

Plaintiff underwent a vocational evaluation in March 2010, at Courage Center Vocational Services. (Tr. 439-49.) He demonstrated the ability to multitask, adjust to interruptions, and change work locations without difficulty. (*Id.*) Plaintiff was advised to volunteer to address his lack of work history. (Tr. 448.) Plaintiff had defaulted on a student loan, and he had a 1997 felony conviction that would impact his education and employment opportunities. (Tr. 449.) The evaluator also noted that pursuing education or a new career often causes stress and anxiety, and it was important for Plaintiff's mental health to be monitored. (Tr. 448.)

Nurse Marva Thurston wrote a letter on Plaintiff's behalf in April 2010, to help him obtain housing based on his disability status. (Tr. 411.) She noted that Plaintiff was treated at her clinic for the past year, and he was working on improving his mental health in every way possible. (*Id.*) He was currently sober. (*Id.*)

Dr. Langsten completed another MSS regarding Plaintiff for the Social Security Administration on April 12, 2010. (Tr. 405-07.) Dr. Langsten opined Plaintiff had slight impairments in understanding and remembering short, simple instructions and in the ability to make judgments on simple work-related decisions. (Tr. 405.) Plaintiff had moderate impairments in carrying out short, simple instructions, and in interacting appropriately with the public. (*Id.*) Plaintiff's was markedly impaired in understanding, remembering and carrying out detailed instructions, and in interacting appropriately with supervisors, coworkers, responding to work pressure, and responding appropriately to changes in a routine work setting. (*Id.*)

Kathleen Sapp wrote a letter in support of Plaintiff's SSI claim on June 28, 2010. (Tr. 410.) She opined that Plaintiff's depressive and anxiety symptoms posed a significant obstacle to his maintaining employment, housing and other basic needs. (*Id.*) He suffered low energy and motivation, difficulty making decisions, anxiety in many situations, and low self-esteem and confidence. (*Id.*) Plaintiff was fully compliant with treatment, but there was little change in his symptoms. (*Id.*)

Licensed Psychologist Harry David Linder also wrote a letter in support of Plaintiff's SSI claim in June 2010. (Tr. 409.) Linder facilitated the group for formerly homeless men that Plaintiff attended for the last seven months. (*Id.*) Linder stated:

> The prevailing factors which would limit the client's employability and capacity to achieve normal functioning appear to be: a general lack of energy and ability to maintain motivational focus; low self-esteem, poor concentration and difficulty making decisions, and a general feeling of either hopelessness or discouragement in the ability for his situation to change.

(*Id.*)

Dr. Langsten wrote a letter on July 28, 2010, opining that Plaintiff was totally disabled by his psychiatric disorders and offering to provide further information upon request. (Tr. 408.) Plaintiff saw Dr. Langsten that day and reported struggling emotionally with low self-esteem. (Tr. 425.) He continued his abstinence from alcohol. (*Id.*) He experienced anxiety but hoped to go back to school. (*Id.*) On mental status examination, his mood was anxious and dysthymic. (*Id.*) In group therapy at the end of August 2010, Plaintiff complained of loneliness and frustration with his lack of social interaction. (Tr. 424.)

Plaintiff saw Dr. Langsten again on September 29, 2010. (Tr. 421-22.) His mental status was unchanged from the last visit. (Tr. 422.) Plaintiff said he wanted to go back to school, but

his unpaid student loan created a barrier. (*Id.*) On October 8, 2010, Plaintiff told his therapy group he had been volunteering at a thrift store but otherwise little had changed. (Tr. 420.) The following month, Plaintiff thought things were going fairly well, but he felt very lonely. (*Id.*) He was open to joining a social group to meet people. (Tr. 418.) On November 16, 2010, Plaintiff told Dr. Langsten he felt more optimistic, and therapy was helpful. (Tr. 417.) Plaintiff was a bit anxious but not depressed, and he was otherwise cognitively intact. (*Id.*) In group therapy, Plaintiff talked about his anxiety around others. (Tr. 416.) At the end of 2010, Plaintiff anticipated obtaining subsidized housing. (Tr. 413.)

Plaintiff was feeling stressed when he moved into a new apartment in January 2011. (Tr. 492.) On mental status examination, Plaintiff was anxious and "somewhat dysthymic at times." (Tr. 493.) Dr. Langsten completed another MSS regarding Plaintiff on January 25, 2011. (Tr. 429-31.) Dr. Langsten's opinion matched his earlier opinion of February 16, 2010. (Tr. 366-68.) Plaintiff was feeling overwhelmed in February 2011, and decided to take a break from volunteering for a while. (Tr. 492.)

Dr. J.P. Felling, in his role as an impartial medical expert for the Social Security Administration, completed a MSS regarding Plaintiff on March 22, 2011. (Tr. 467-69.) He opined that Plaintiff was mildly impaired in understanding, remembering and carrying out simple instructions, moderately impaired in making judgments on simple work-related decisions, and markedly impaired in understanding, remembering and carrying out complex instructions. (Tr. 467.) Plaintiff was also moderately impaired in interacting appropriately with the public, supervisors and coworkers, and in responding to usual work situations and changes in a routine work setting. (Tr. 468.)

Dr. Felling also responded to interrogatories regarding Plaintiff.  (Tr. 476-82.)  He reviewed new evidence on Plaintiff's SSI claim.  (Tr. 477.)  The new evidence did not change the opinion he gave at the hearing.  (Tr. 478-79.)  Dr. Felling opined that Plaintiff was mildly restricted in activities of daily living; he had moderate difficulties in maintaining social functioning; he had marked difficulties in maintaining concentration, persistence or pace; and he did not have any episodes of decompensation.  (Tr. 479.)  Dr. Felling explained his opinion:

> The claimant has reasonably average cognitive abilities (Ex.C17F) that should allow him to complete at least simple, routine tasks. He does show some social anxiety, but is not agoraphobic.  He presents himself as being somewhat lonely, which implies that he would likely benefit from routine contact with others.  However, his social anxiety symptoms would limit his capacity to deal with others except in a brief, superficial manner.

(Tr. 482.)

On March 29, 2011, Plaintiff told Dr. Langsten he was feeling good about his new apartment.  (Tr. 487.)  He was doing less volunteer work and was socializing very little.  (Tr. 488.)  On mental status examination, he was a bit anxious.  (*Id.*)  In therapy with Kathleen Sapp in early April 2011, Plaintiff was feeling discouraged, focusing on the past, and not leaving his apartment much, but he improved toward the end of the month.  (Tr. 486-87.)  It was taking time to unlearn his previous self-defeating thinking and behavior.  (Tr. 486.)  He focused on the past and felt discouraged.  (*Id.*)

When Plaintiff saw Dr. Langsten on May 17, 2011, he was doing okay and felt his medications were helping.  (Tr. 483.)  Plaintiff was anxious but not depressed, and his mental status examination was otherwise normal.  (Tr. 483-84.)  On July 14, 2011, Plaintiff told Dr. Langsten he was not volunteering and had missed group therapy.  (Tr. 499.)  Plaintiff was struggling with negative thoughts and anxiety over his social security hearing.  (*Id.*)  In August

10

2011, Plaintiff had not met his goal of going out more often. (Tr. 496.) He had difficulty with self-motivation. (*Id.*)

### C. <u>Hearing Testimony</u>

At the time of the first administrative hearing on January 24, 2011, Plaintiff lived alone in an apartment. (Tr. 31-33.) Plaintiff had been on social security disability from 1989 through 1997, and he was homeless before and after that period. (Tr. 42.) Although Plaintiff had a felony conviction, he had never spent time in prison, and he was no longer on probation or parole. (Tr. 33-34.) He did not have a driver's license, so he walked and used the bus to get around. (Tr. 34.) Recently, he spent four hours per week volunteering at libraries, and he volunteered at a thrift store, testing appliances, two hours per week. (Tr. 34-35.) Plaintiff also spent free time at a library, using the Internet. (Tr. 36.) Plaintiff went to the YMCA twice a week to use the steam room and whirlpool. (*Id.*) He had acquaintances whom he would say hello to if he saw them, but he did not have friends or any social life. (Tr. 37.) He saw his brother four or five times a year. (*Id.*) Plaintiff's only income was general assistance. (Tr. 37-38.)

Plaintiff lost his last full-time job as a mail clerk due to alcohol use. (Tr. 35.) He had not looked for work since 2009 and did not think he could keep a schedule. (Tr. 38.) He did not have reason to get out of bed most days. (*Id.*) Plaintiff also felt his anxiety precluded him from working. (Tr. 38-39.) He started volunteering because it was required to retain his transitional housing. (Tr. 38.) Plaintiff had not volunteered at the library recently because he was anxious. (Tr. 40-41.) He continued to attend group therapy for depression and anxiety. (Tr. 39-40.)

Dr. J.P. Felling testified at the hearing as a medical expert. (Tr. 42-43.) He identified Plaintiff's impairments as major depressive disorder, generalized anxiety, dysthymia, social

anxiety, history of alcohol dependence, and rule out personality disorder with avoidant features. (Tr. 42-43.) Dr. Felling rated the severity of Plaintiff's mental impairments under the paragraph B criteria of the listings. (Tr. 43-44.) Plaintiff had mild difficulties in activities of daily living, marked limitation in concentration, persistence or pace, moderate impairment in social functioning, and no episodes of decompensation, although Plaintiff had been functioning at a very low level for a long time. (Tr. 43-44.)

The ALJ asked Dr. Felling to describe Plaintiff's work restrictions. (Tr. 44.) Dr. Felling indicated Plaintiff would be limited to simple, routine tasks; brief, superficial contact with others; little or no contact with the public; work with a very small group of coworkers; and low stress work with respect to production quotas and speed of functioning. (Tr. 44-45.) Dr. Felling agreed with Plaintiff's counsel that chronic anxiety, depressed mood, and emotional instability could support marked limitations in social functioning and in maintaining concentration, persistence or pace but Plaintiff's actual degree of severity was uncertain. (Tr. 45.) Dr. Felling did not see specific evidence of Plaintiff decompensating, but he noted social anxiety would create a tendency to avoid work. (Tr. 46.) On the other hand, Plaintiff went to groups regularly, but it was a sheltered environment. (*Id.*)

J. Harren testified as a vocational expert ("VE") at the hearing. (Tr. 272, 46.) The ALJ posed a hypothetical vocational question, assuming an individual who was 49-50-years-old, with a high school education, past relevant work as outlined by the VE, impaired by polysubstance dependence by history, depression, dysthymia, social anxiety, and who was limited to simple, unskilled work with brief, superficial and infrequent contact with others, very minimal or no public contact; work with a small group of individuals, six or fewer, without frequent changes in the composition of the group; and no high production goals, no fast paced assembly line or timed

piece work.  (Tr. 46-48.)  Harren testified that such a person could perform Plaintiff's past relevant work as a mail clerk and as a janitor.  (Tr. 48.)  Such a person could also perform work as a packager[5] and light exertional assembly jobs.[6]  (Tr. 49.)

The ALJ posed a second hypothetical question about an individual who would be restricted to light work and was severely limited but not precluded from understanding and carrying out details, using judgment, interacting with others, and responding to work pressure or changes.  (*Id.*)  The VE testified that such a person could perform the same jobs.  (*Id.*)  The ALJ asked a third hypothetical question where a similar individual would be unable to attend to work with persistence or pace and would be absent from work more than two days per month due to waxing and waning symptoms.  (Tr. 50.)  Harren testified there would be no work available to such a person.  (*Id.*)

A second administrative hearing was held on August 29, 2011.  (Tr. 53.)  Plaintiff's testimony about his activities had not changed except for the fact that he now saw his brother twice a month for grocery shopping, and he had gone to the movies with his brother once.  (Tr. 59.)  Plaintiff watched television most of the day.  (*Id.*)  He still hoped to get job training.  (Tr. 61.)  He went to classes for two weeks at the Workforce Center but then gave up.  (*Id.*)  He could not continue his education because he had outstanding student loan debt.  (Tr. 62.)  Plaintiff also had about four "slips" in sobriety over the last two years and three months.  (*Id.*)  The slips only lasted one day.  (*Id.*)

---

[5] Dictionary of Occupational Titles ("DOT") Code 920.687-034, with 1,500 such jobs in Minnesota.

[6] DOT 920.687-026.

Kathleen Sapp, Plaintiff's therapist, testified at the hearing.  (Tr. 63-65.)  Sapp worked with Dr. Langsten as part of the case consultation team for Plaintiff's care since November 2009.  (Tr. 64.)  Plaintiff's present diagnoses were major depressive disorder and generalized anxiety disorder.  (Tr. 65.)  Sapp testified that she agreed with Dr. Langsten's opinion that Plaintiff would have marked limitation, defined as seriously limited but not precluded, in interacting appropriately with supervisors and coworkers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting.  (*Id.*)  Sapp also testified that Plaintiff would have marked limitations in maintaining concentration, persistence or pace, assuming that meant initiating, following through, and completing tasks.  (*Id.*)

The ALJ then posed a hypothetical vocational question to the VE, assuming a 48-50-year-old individual with a high school education, prior work history as a mail room clerk and janitor, impaired by depression, generalized anxiety and alcohol dependence by history, limited to work where servicing the public was not a primary task, work with brief and superficial contact with others, and limited to unskilled to semiskilled work.  (Tr. 66-67.)  The VE testified such a person could perform Plaintiff's past relevant work, and there are 40,000 janitor jobs in Minnesota, and 3,800 mail room clerk jobs in Minnesota.  (Tr. 67.)

For a second hypothetical question, the individual would have no ability to maintain concentration for a two-hour period, no ability to complete a regular workday or adjust to a routine at work, and would be absent more than two days per month.  (*Id.*)  The VE testified there would be no work in the regional or national economy for such a person.  (*Id.*)

**D.    The ALJ's Decision**

The ALJ issued his decision denying Plaintiff's application for SSI on November 8, 2011. (Tr. 8-22.) The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. *See* 20 C.F.R. § 416.920. At the first step of the evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 24, 2009, the application date. (20 C.F.R. § 416.971 *et seq*.) (Tr. 13.) At the second step of the process, the ALJ found that Plaintiff had severe impairments of major depressive disorder; dysthymia; anxiety disorder, NOS; social anxiety; history of alcohol dependence; and rule-out personality disorder with ongoing avoidant features. (20 C.F.R. § 416.920(c)). (*Id.*)

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926)). (Tr. 14.) Although Plaintiff had affective, anxiety-related, personality and substance addiction disorders under listings 12.04, 12.06, 12.08 and 12.09, the ALJ found Plaintiff did not meet the paragraph B criteria of the listings, requiring at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. (*Id.*) The ALJ found Plaintiff had only mild restrictions in activities of daily living because although Plaintiff was homeless and living in a shelter, he spent the typical day going to libraries, museums and other shelters. (*Id.*) He did his laundry as needed and did crossword puzzles daily. (*Id.*) He later obtained his own apartment, obtained a YMCA membership, went to therapy, volunteered, and participated in

vocational rehabilitation. (Tr. 15.) He spent four hours per day using his computer, playing games and creating a music collection. (*Id.*) He also watched television and videos. (*Id.*)

The ALJ found Plaintiff had moderate difficulties in social functioning. (*Id.*) He had some friends but did not socialize much. (*Id.*) Plaintiff denied having difficulty getting along with others. (*Id.*) He saw his brother twice a month to shop for groceries. (*Id.*) Dr. Felling thought Plaintiff would benefit from routine contact with others due to his loneliness. (*Id.*) The ALJ found Plaintiff had marked difficulties with concentration, persistence and pace. (*Id.*) Plaintiff was consistently anxious and also depressed at times, although he was otherwise cognitively intact. (*Id.*) The ALJ found that Plaintiff had no episodes of decompensation, and there was no evidence establishing the paragraph C criteria of the listings. (*Id.*)

At the next step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: no work where servicing the public is a primary task; brief and superficial contact with others; and unskilled to semi-skilled work.

(Tr. 16.)

Plaintiff testified he could not work a full-time job because he had trouble showing up to work regularly, completing tasks correctly, and handling the social anxiety of working with others. (Tr. 17.) Depression made it difficult for him to get out of bed and anxiety made it difficult for him to concentrate and follow instructions. (*Id.*) The ALJ concluded that, consistent with his moderate restriction in maintaining concentration, persistence or pace, Plaintiff could perform unskilled to semiskilled work. (*Id.*) The ALJ credited Dr. Felling's opinion because it was consistent with the weight of the objective findings, supported by a longitudinal view of the

evidence, and based on Dr. Felling's specialized knowledge in assessing disability.  (*Id.*)  Based on Plaintiff's moderate restrictions in maintaining social functioning, the ALJ limited him to work involving no more than brief and superficial contact with others, and work where servicing the public is not the primary task.  (*Id.*)

The ALJ noted that Plaintiff engaged in therapy and psychiatric care for two and half years, and it was beneficial to him.  (Tr. 18.)  Although he had trouble engaging socially, he was able to volunteer and go into the community on a regular basis.  (*Id.*)  Plaintiff sought mental health treatment after losing his housing due to drinking.  (*Id.*)  He had a history of employment and relationship problems related to drinking.  (*Id.*)  His mental status examinations were normal, apart from anxiety and intermittent dysthymia.  (*Id.*)  Although he had severe stressors, his GAF score was 50-60, indicating moderate symptoms.  (*Id.*)  Plaintiff remained sober most of the time, with four "slips" since June 2009.  (*Id.*)  He reported improvement in therapy, and he stated he would rather learn a trade than go on disability.  (*Id.*)  He pursued job training and volunteered at a thrift store.  (Tr. 19.)  In March 2010, Plaintiff underwent vocational rehabilitation testing, resulting in high average to well above average scores, and the ability to a complete six-hour testing session without physical complaints or mental fatigue.  (*Id.*)  Plaintiff had fewer signs of depression in 2011.  (*Id.*)

The ALJ stated her RFC opinion was consistent with Plaintiff's daily activities because he was able to move out of a shelter and into an apartment, obtain YMCA membership, pursue dental care, and pursue vocational rehabilitation.  (*Id.*)  Plaintiff's failure to continue vocational programming was based on outstanding student loan debt, not for mental health reasons.  (*Id.*)  In August 2011, Plaintiff used his bike and the public bus for transportation, and he could take care

of his apartment and personal needs. (*Id.*) He spent his days at the library, YMCA, and using his computer four hours per day. (*Id.*)

The ALJ considered Plaintiff's sporadic work history, noting Plaintiff lost his last job in 2001 due to drinking alcohol. (Tr. 20.) This raised the issue of whether Plaintiff's unemployment was related to his mental impairments. (*Id.*)

The ALJ rejected Dr. Langsten's opinions because they were inconsistent with his treatment notes, indicating Plaintiff was stable and taking advantage of community resources to establish housing and vocational assistance. (*Id.*) Dr. Langsten's opinions were in contrast to Dr. Felling's opinion, which the ALJ gave great weight. (*Id.*)

Kathleen Sapp testified at Plaintiff's hearing and agreed with Dr. Langsten's opinion that Plaintiff had marked limitations in the following: interacting with coworkers and supervisors; responding appropriately to work pressures and changes in routine; and carrying out detailed instructions. (*Id.*) The ALJ found Sapp's opinion to be inconsistent with her treatment notes, indicating that Plaintiff was lonely but attending therapy and doing fairly well. (*Id.*)

The ALJ gave little weight to Dr. Linder's June 2010 opinion because notes from Plaintiff's group therapy sessions did not suggest persistent problems with Plaintiff's energy and ability to focus. (*Id.*) Plaintiff's performance on a March 2010 vocational assessment was also contrary to Dr. Linder's opinion. (Tr. 20-21.) The ALJ rejected Case Worker Stan McClure's statements because they were inconsistent with the overall record.[7] (Tr. 21.) The ALJ gave

---

[7] In a third-party function report completed for the SSA by Case Worker Stan McClure on June 13, 2009, McClure described Plaintiff's daily routine while he was living in a shelter, noting that Plaintiff went out every day. (Tr. 194-97.) Plaintiff also did crossword puzzles daily. (Tr. 198.) Plaintiff was isolated and experienced decreased memory and concentration. (Tr. 199.)

some weight to the state agency psychologists' opinions but found Plaintiff had greater limitations than they opined. (*Id.*)

The ALJ found Plaintiff was able to perform his past relevant work as a mail room clerk and a janitor. (20 C.F.R. § 416.965). (*Id.*) Thus, the ALJ determined Plaintiff was not under a disability, as defined in the Social Security Act, from June 24, 2009 through the date of the decision. (20 C.F.R. § 416.920(f)). (Tr. 21-22.)

## II. STANDARD OF REVIEW

The claimant bears the burden of proving his or her entitlement to disability benefits. 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brace v. Astrue*, 578 F.3d 882, 884 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Id.*

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3

F.3d at 1213 (if supported by substantial evidence, the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin*, 811 F.2d at 1199.

## III.    DISCUSSION

Plaintiff contends that he is disabled because he suffers from marked deficiencies of concentration, persistence or pace, preventing him from sustaining work-related activities on a regular and continuous basis, eight hours a day, five days per week.  Plaintiff asserts the ALJ failed to ask Dr. Felling how marked limitations in maintaining concentration, persistence or pace would limit Plaintiff's ability to work.  And, at the first hearing, when the ALJ asked the VE a hypothetical question which accounted for marked impairment in concentration, persistence or pace, the VE testified there would be no jobs available in the regional or national economy.  Thus, Plaintiff alleges the record supports disability.

Plaintiff's second contention is that the ALJ's decision is internally inconsistent.  The ALJ stated that he awarded "great weight" to Dr. Felling's opinion.  Consistent with Dr. Felling's testimony, the ALJ twice stated in her decision that Plaintiff had marked limitations in concentration, persistence or pace.  However, at step four of the evaluation, the ALJ determined that Plaintiff had only moderate limitations in concentration, persistence or pace.  Plaintiff further contends the ALJ's RFC finding, and the hypothetical question based on the RFC finding, did not incorporate any limitations in maintaining concentration, persistence or pace.

Even if the ALJ intended to find Plaintiff had only a moderate restriction in concentration, persistence or pace,  Plaintiff contends the hypothetical question to the vocational

expert was in error. Relying on *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996), 20 C.F.R. § 416.945,[8] and Social Security Ruling 85-15,[9] Plaintiff contends that limiting a person to unskilled work does not adequately reflect moderate, let alone marked limitations in maintaining concentration, persistence or pace. Plaintiff requests reversal with an award of benefits and, only in the alternative, requests remand for further proceedings.

It is true that the ALJ agreed with Dr. Felling's opinion that Plaintiff had marked limitations in maintaining concentration, persistence or pace when rating the paragraph B criteria under the mental impairment listings at step three of the disability evaluation process. (Tr. 14, 15.) Plaintiff, however, did not meet or equal a listed impairment at step three because the paragraph B criteria of the listings require two areas of functioning that are markedly limited or one markedly limited area of functioning and repeated episodes of decompensation, each of

---

[8] 20 C.F.R. § 416.945(c) provides:

> Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

[9] Social Security Ruling ("SSR") 85-15 provides in relevant part:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. . .

SSR 85-15, 1985 WL 56857, at *4 (1985).

extended duration.  (Tr. 15.)  A claimant's marked limitations in concentration, persistence or pace under the paragraph B criteria does not by itself establish disability.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04(B), 12.06(B), 12.08(B).

In Social Security Ruling 96-8p, the SSA described its interpretation of the residual functional capacity assessment.[10]  Where, as here, the ALJ finds marked limitations in concentration, persistence or pace, the ALJ is required to make a more detailed assessment of various mental functions required to perform work, and determine how those functions would be impacted by the claimant's marked limitations.  SSR 96-8p, 1996 WL 374184, at *1 ("The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ")  The ALJ correctly identified the difference between the paragraph B ratings and the RFC assessment.  (Tr. 16.)  In arriving at Plaintiff's mental RFC, however, the ALJ stated:

> The undersigned finds the claimant is capable of performing unskilled to semi-skilled work.  This limitation is consistent with the claimant's "moderate" degree of restriction in maintaining concentration, persistence or pace, which is assessed in detail above.  It is also consistent with the opinion and testimony of Dr. James Felling, an impartial psychological expert . . .  Dr. Felling also provided an opinion on March 22, 2011, in response to interrogatories, in which he indicated the claimant had moderate limitations in interacting with others and in making simple, work-related decision, and had marked limitations in handling complex instructions and tasks.

(Tr. 17.)

---

[10] SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996).  Courts must give deference to an agency's interpretation of its own regulations, but Social Security Rulings are binding only on the SSA.  *Newton*, 92 F.3d at 693.

There are two problems with this finding. The first problem is an obvious inconsistency in the ALJ's decision. The ALJ first stated Plaintiff had marked limitations in concentration, persistence or pace, but the ALJ later stated Plaintiff had moderate limitations in concentration, persistence or pace. (Tr. 14, 15, 17.) The ALJ relied on Dr. Felling's testimony, and Dr. Felling testified and submitted interrogatory responses opining Plaintiff had marked limitations in concentration, persistence or pace.

The second problem with the ALJ's decision is that even if the ALJ intended to find only moderate restrictions in concentration, persistence or pace, the ALJ's RFC finding is contrary to the holding in *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996). In *Newton*, the Eighth Circuit Court of Appeals found it was insufficient to accommodate a moderate restriction in concentration, persistence and pace simply by limiting the person to simple, unskilled work. *Id.* In *Newton*, two providers had indicated the claimant's concentration problems did not limit his abilities to follow short and simple instructions and make simple work-related decisions. *Id.* A third provider said the claimant could maintain concentration for simple work. *Id.* This did not cure the deficiency in the ALJ's RFC assessment because the vocational expert testified that the claimant's concentration and persistence problems related to basic work habits needed to maintain employment and would cause problems regardless of the physical or skill level of work. *Id.*

The Eighth Circuit distinguished *Newton* in *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997). The ALJ found Brachtel often had deficiencies in concentration, persistence or pace. *Id.* The court held that the ALJ's hypothetical question was sufficient because it limited Brachtel to "simple routine repetitive work, which does not require close attention to detail . . . and [Brachtel] should not work at more than a regular pace." *Id.* Thus, the ALJ had addressed the

concentration impairment with a limitation to work that did not require close attention to detail, and the ALJ addressed the pacing impairment with a limitation to work at a regular pace. *Id.*

The ALJ here limited Plaintiff to unskilled or semiskilled work. (Tr. 16.) In *Newton*, where the claimant had only moderate limitations in concentration, persistence or pace, it was insufficient for the ALJ to address only the skill level of Plaintiff's ability to work. 92 F.3d at 695. An ALJ is required to address other mental abilities that are affected by limitations in concentration, persistence or pace. *Brachtel*, 142 F.3d at 421. The Commissioner, however, contends the ALJ's failure to include work restrictions reflecting Plaintiff's marked limitations in concentration, persistence or pace in the RFC is harmless, because the ALJ posed a hypothetical question to the VE including a limitation to low stress work, meaning no high production goals, no fast paced assembly line or timed piece work. In response to this hypothetical, the VE testified that such a person could perform Plaintiff's past relevant work, as well as packaging and light assembly jobs.

The phrase "concentration, persistence or pace" "refers to the ability to sustain attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. 404, Subpart P, Appendix One, § 12.00(C)(3).

> Strengths and weaknesses in areas of concentration and attention can be discussed in terms of you ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or objective.
>
> We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on

> how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

(*Id.*)

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule.)

*Shaw v. Apfel*, 220 F.3d 937, 939 n.3 (quoting Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (Social Security Administration, July 2, 1996)).

It is true that the ALJ posed an alternative hypothetical question to the VE where the ALJ limited Plaintiff to low stress work without a fast pace or high production goals. While this addressed Plaintiff's concentration and pace impairments, it did not address Plaintiff's limitation in persistence; his ability to appropriately complete tasks on a sustained basis under the stress of employment during a normal day or work week. The following evidence shows that Plaintiff's depression and anxiety prohibit him from persisting at tasks on a sustained basis and from completing a normal work week. To begin with, Plaintiff's alleged onset date coincides with losing his housing where he had lived for seven years "in a void," essentially doing nothing. Dr. Felling, whose opinion the ALJ professed to rely on, qualified his opinion that Plaintiff had not experienced episodes of decompensation by explaining that Plaintiff had been functioning at a very low level for a long time. Dr. Felling also testified that Plaintiff's social anxiety could create a tendency to avoid work, and although he noted that Plaintiff attended therapy groups regularly, he qualified this by noting that therapy is a sheltered environment. In other words, Plaintiff's ability to overcome his social anxiety to regularly attend group therapy may not be equivalent to Plaintiff's ability to overcome social anxiety to engage in competitive employment. Plaintiff exhibited anxiety in nearly all of his mental status examinations, although his other cognitive functions were intact.

25

Next, Plaintiff's testimony that he did not think he could keep a schedule due to his depression and anxiety is supported by his treating provider's opinions and other evidence in the record. Plaintiff's therapists, Sapp and Linder, agreed that Plaintiff suffered low energy and motivation, low self-esteem or self confidence, and difficulty making decisions. At the hearing, Sapp testified that Plaintiff had marked limitations in concentration, persistence or pace, and this meant limitations in initiating, following through, and completing tasks. Although Plaintiff was able to attend therapy and found it helpful, during treatment he told Sapp it was taking time to unlearn his previous self-defeating thinking and behavior. Given Plaintiff's long history of homelessness and recent seven year "void", it is not surprising that he was finding it difficult to find the energy, motivation, and self-confidence to seek and maintain employment, especially in the context of his social anxiety.

Rather than crediting Plaintiff for his desire to go to school and find a new career, based on Plaintiff's minimal efforts to do so, the ALJ found Plaintiff's testimony that depression and anxiety prevented him from working not credible. Plaintiff did perform well in a six-hour vocational testing session, and he volunteered a few hours a week at a library and a thrift store, although his low energy and motivation and anxiety caused him to skip volunteering at times. While Plaintiff has benefitted from therapy and found some hope, his small efforts at overcoming his longstanding mental impairments do not indicate that he can sustain full-time competitive employment at this time. *See Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (the court's admonition that RFC meant the ability to perform requisite acts day in and day out underscored the need to consider the frequency and independence of activities performed by the claimant, and the claimant's ability to sustain the activities over time.") The record as a whole suggests that Plaintiff remains subject to periods when he cannot overcome his low energy, low motivation, and anxiety around others to maintain persistence in competitive employment.

When the ALJ posed an alternative hypothetical question to the VE, accounting for Plaintiff's marked limitations in persistence by stating the individual would be unable to attend to work with persistence or pace and would be absent from work more than two days per month due to waxing and waning symptoms, the VE testified that there was no competitive employment such a person could perform.  (Tr. 50.)  Where the VE's response to a proper hypothetical question indicates that there is no employment the claimant can perform, the appropriate remedy is to remand for an award of benefits.  *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001) (remanding for award of benefits where the VE's response to an alternative hypothetical question by Plaintiff's counsel established there would be no jobs in the national economy for the Plaintiff); *Taylor v. Chater*, 118 F.3d 1274, 1279 (8th Cir. 1997) (remand is unnecessary where the record overwhelmingly supports disability, as in the case where Plaintiff's counsel "presented a hypothetical question to the vocational expert that properly characterized [the claimant's] disabilities, [and] the expert testified that there were no jobs in the national or regional economy that such a hypothetical individual could perform.")

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment [Docket No. 12] be **GRANTED**, and the case be remanded for reversal and award of benefits;

2.    Defendant's Motion for Summary Judgment [Docket No. 18] be **DENIED;**

3.    The case be dismissed, and judgment be entered.

Dated: October 31, 2013            s/Arthur J. Boylan

ARTHUR J. BOYLAN

United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before November 15, 2013.